**David L. TIMOTHY, et al., Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. No. C 80–445A.**

United States District Court,
D. Utah, C.D.

June 20, 1985.

Allan M. Swan, Kirton & McConkie, Salt Lake City, Utah, for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., Donald E. Jose, Asst. Director, Torts Branch, Ralph H. Johnson, Trial Atty., Torts Branch, Washington, D.C., Brent D. Ward, U.S. Atty., Salt Lake City, Utah, for defendant.

## I. INTRODUCTION

ALDON J. ANDERSON, Senior District Judge.

In 1980, plaintiffs filed a Federal Tort Claims Act complaint alleging that the certain diseases, contracted by plaintiffs or plaintiffs' decedents, were caused by exposure to radioactive fallout from detonations at the Nevada Test Site.

The United States has filed three previous motions for partial summary judgment in this action, each of which has been granted. The first motion requested dismissal of this action as it pertained to the death of plaintiffs' decedent Hale Holgate from chronic lymphatic leukemia. The affidavits filed by the United States in support of its motion indisputably demonstrated that chronic lymphatic leukemia is not causally associated with exposure to ionizing radiation.

The United States' second motion for partial summary judgment requested dismissal of plaintiff Alfred Rosenhan's complaint as barred by the Federal Tort Claims Act statute of limitations, 28 U.S.C. § 2401. Based upon the documents submitted by the United States in support of its motion, this Court concluded at page 4 of its August 8, 1983 Order:

> From the above evidence it seems clear that Mr. Rosenhan was fully aware of his injury and its probable cause by radioactive fallout no later than 1978. Other evidence presented by the Government without dispute may show that he was aware of these crucial facts much earlier—whether or not he was, it is certain that he was aware more than two years before he filed his administrative claim.

In its third motion for partial summary judgment the United States requested dismissal of this action as it pertained to plaintiff Sherman Holgate's autoimmune thyroiditis and hypothyroidism diseases. The affidavits presented by the United States in support of its motion showed that autoimmune thyroiditis has not been associated with exposure to ionizing radiation and that radiation-induced hypothyroidism occurs

only after exposure to very large doses of radiation—thousands of times greater than Holgate's reconstructed dose. Plaintiff Holgate consented to the dismissal of his complaint.

The United States' first three motions for partial summary judgment demonstrate that this procedure is an efficient means of obviating the need for costly and lengthy trials by dismissing claims in which there is no genuine issue as to any material fact. Accordingly, this Court encouraged the United States to continue filing such motions regarding those diseases in this action which the scientific community has determined to be non-radiogenic. In response, the United States filed a fourth partial summary judgment motion. In support of the motion the United States commissioned several dosimetric studies and caused the medical records and pathological tissue samples of four additional plaintiffs or their decedents to be examined by medical experts. Their uncontradicted findings are reported below.[1]

Plaintiffs Gil Mitchell and Lucille Whitehead contracted a disease known variously as malignant lymphoma, lymphosarcoma, or histiocytic lymphoma (lymphoma). *See* paragraphs 2 and 3 of the Affidavit of Dr. William C. Moloney Exhibit B, Memorandum in Support of the United States' Motion for Partial Summary Judgment, hereinafter "Memorandum".

Plaintiffs' decedent Becky Farnsworth died of a disease known variously as schwannoma, neurogenic sarcoma, malignant neurilemmoma or peripheral nerve sheath tumor (neurofibrosarcoma). *See* paragraphs 2 and 3 of the Affidavit of Dr. Bernd W. Scheithauer (Exhibit C, Memorandum).

Plaintiffs' decedent Lynette Tew died of a disease clinically diagnosed as glioblastoma multiforme (CNS tumor). The pathological study of tissue obtained at surgery included brain tissue with no tumor present. The diagnosis of glioblastoma remains possible and consistent with the clinical course, but cannot be considered proven. *See* paragraphs 4 and 5 of the Affidavit of Dr. George B. Hutchison (Exhibit D, Memorandum).

For the reasons set forth below this Court concludes there is no material issue of fact that the diseases of the above named plaintiffs or plaintiffs' decedents were not caused by exposure to radioactive fallout from the Nevada Test Site.

## II. LYMPHOMA

Recently, pursuant to the Orphan Drug Act (Section 7B, Public Law 97–414), the United States Department of Health and Human Services established the National Institute of Health Ad Hoc Working Group to Develop Radioepidemiological Tables.[2] This group was required by the statute to review the epidemiological data regarding radiation-induced diseases and construct statistical tables showing the

---

1. By a written stipulation filed with the Court on April 4, 1983, the parties agreed that the medical specimen slides and medical records pertaining to these plaintiff and plaintiffs' decedents, which had been received by counsel for the United States, were authentic slides and true and accurate records.

2. This special study group included many eminent scientists: Dr. Gilbert Beebe, a long-time researcher of health effects among the Japanese atomic bomb survivors and an expert in the Clinical Epidemiology Branch of the National Cancer Institute; Dr. David G. Hoel, Director of Biometry and the Risk Assessment Program of the National Institute of Environmental Health Sciences; Mr. Seymour Jablon, member of the Advisory Committee on the Radiation Effects Research Foundation of the National Academy

of Sciences; Dr. Rosalyn S. Yalow, Director of the Solomon A. Berson Research Laboratory at the Veterans Administration Hospital, Bronx, New York and 1977 recipient of the Nobel Prize for Medicine. Dr. Charles E. Land, Health Statistician of the Environmental Epidemiology Branch of the National Cancer Institute; Dr. Oddvar F. Nygaard, Director, Division of Radiation Biology at Case Western Reserve University; Dr. Arthur C. Upton, Chairman of the Department of Environmental Medicine at the New York University Medical Center and former Director of the National Cancer Institute; and Dr. Joseph E. Rall, Deputy Director of the National Institutes of Health. *See* paragraph 3 of the Affidavit of Dr. Rosalyn S. Yalow (Exhibit 3, Memorandum).

probability that certain cancers result from prior exposure to specific doses of radiation. As noted in paragraph 4 of the Affidavit of Nobel Laureate Rosalyn S. Yalow (Exhibit 3, Memorandum), on September 18, 1984, this group reported to the Committee on Labor and Human Resources of the United States Senate that, based on the latest available data, a causal relationship between ionizing radiation exposure and lymphoma could not be established. On January 4, 1985, the NIH Working Group published its final report. Lymphoma was listed as an excluded site; that is, a causal relationship between the disease and exposure to ionizing radiation could not be established. *See* "Report of the National Institutes of Health Ad Hoc Working Group to Develop Radioepidemiological Tables," U.S. Department of Health and Human Services (1985).

In a paper entitled, "Leukemia, Lymphoma, and Multiple Myeloma," included in a recent treatise on the subject of radiation-induced disease, Dr. Robert W. Miller and Dr. Gilbert W. Beebe of the Clinical Epidemiology Branch of the National Cancer Institute state:

Ionizing radiation is strongly clastogenic (breaks chromosomes), but its effect on immunologic defenses is not the sort that predisposes to lymphoma. The unequal susceptibility of various tissues to the carcinogenic effects of ionizing radiation and its possible explanation, illustrate the need to consider influences other than radiation in epidemiologic studies of persons exposed to this physical agent [radiation].

At page 18 of their paper the authors conclude that, "[r]adiation does not induce chronic lymphocytic leukemia or lymphoma." *See* paragraph 7 of the Affidavit of Dr. Joseph L. Lyon (Exhibit A, Memorandum).

The largest and most complete epidemiological study of the relationship between ionizing radiation and cancer incidence is that based upon the Japanese atomic bomb survivors. The most recent epidemiological data from this study show that a causal relationship between exposure to ionizing radiation and lymphoma cannot be established. *Id.*, paragraph 6.

Dr. William C. Moloney, an Emeritus Professor of Medicine at Harvard Medical School and former Deputy Director of the Atomic Bomb Casualty Commission in Hiroshima, Japan, states in paragraph 5 of his affidavit (Exhibit B, Memorandum):

I have had considerable clinical experience in the treatment of lymphosarcoma [lymphoma]. In a series of over one thousand cases which I have followed over the past sixteen years, ionizing radiation has not been an etiologic [causative] factor. It is my expert opinion, as a matter of reasonable medical certainty, that there is no causal relationship whatsoever between the diseases contracted by Mr. Mitchell and Mrs. Whitehead [lymphomas] and exposure to ionizing radiation.

### III. NEUROFIBROSARCOMA AND CNS TUMOR

■ The causal relationship between neurofibrosarcoma and CNS tumors and exposure to ionizing radiation, like lymphoma, has been studied extensively. Dr. Bernd W. Scheithauer, a neuropathologist at the Mayo Clinic, searched the medical records of Mayo Clinic, from the year 1912 to 1981 in an effort to study the x-radiation exposure history of all Mayo Clinic patients with neurofibrosarcoma. In paragraph 5 of his affidavit (Exhibit C, Memorandum), Dr. Scheithauer states:

My own research and the medical literature indicate that ionizing radiation can induce neurogenic sarcoma. However, the radiation dose and the incidence of neurogenic sarcoma appear to be related; that is neurogenic sarcoma has only been reported where there has been a therapeutic dosage in excess of several hundred rads administered.

The major studies by Dr. George B. Hutchison, Professor of Epidemiology at Harvard School of Public Health, illustrate that an excess of neurofibrosarcoma and CNS tumors has not been found in popula-

tions exposed to small radiation doses. *See* paragraphs 2 and 6 of the Affidavit of Dr. George B. Hutchison (Exhibit D, Memorandum).

Similarly, the studies by Dr. Arthur C. Upton, Professor and Chairman of the Department of Environmental Medicine at New York University School of Medicine and former Director of the National Cancer Institute, demonstrate that a few neurogenic tumors and glioblastoma multiforme have been reported to occur after exposure to hundreds or thousands of rem, but there is no evidence that they are induced at lower doses.[3] *See* paragraph 5 of the Affidavit of Dr. Arthur C. Upton (Exhibit H, Memorandum).

Therefore, to determine whether Farnsworth's and Tew's tumors may be attributable to Nevada Test Site fallout exposure, it is necessary to calculate their probable fallout doses. To assure the greatest possible accuracy in calculating the doses, the United States commissioned several different dosimetry studies, and paid for an additional dosimetry study requested by plaintiffs' counsel.

The first study involved calculating the doses to Farnsworth and Tew by using fallout measurements made by Dr. Robert C. Pendleton of the University of Utah. This study is significant because plaintiffs have stated they will rely upon the Pendleton measurements to show they or their decedents were exposed to a harmful amount of fallout. *See* Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion to Amend August 14, 1984 Order, page 3. Counsel for the United States requested the custodian of Dr. Pendleton's fallout data collection, Dr. Ray D. Lloyd of the University of Utah Radiobiology Laboratory, to calculate the external and inter-

nal dose to Farnsworth and Tew using Dr. Pendleton's fallout measurements.[4]

Remarkably, the Pendleton measurements indicated 7.3 times *less* fallout deposition than the measurements used by Lawrence Livermore National Laboratory to compute radiation doses for plaintiffs' decedents. *See* paragraph 4 of the Affidavit of Dr. Ray D. Lloyd (Exhibit G, Memorandum).

Dr. Pendleton, Dr. Lloyd, and other researchers at the University of Utah also measured the internal deposition of radioactivity in people in Duchesne County, where plaintiffs contend their fallout exposure occurred. These studies began in 1962 and some have continued to the present time. As Dr. Lloyd observes in paragraph 5 of his affidavit (Exhibit G, Memorandum):

> In particular, there were included in this number a few people during 1962 to 1966 who were living near the [plaintiffs'] decedents dairy farms in the vicinity of Mountain Home and Talmadge [Utah] ... One of these subjects was a female born in 1949, the same year as Lynette Tew [plaintiffs' decedent who contracted a CNS tumor]. Others were young females born in 1946 and 1947; 2 adult females; young men born in 1956 and 1957; and an adult male....

From these measurements Dr. Lloyd concludes:

> In summary, the Cs-137 in both the soils collected near Mountain Home and Talmadge, Utah, in the 1960's and in the people residing in the vicinity indicate that the internal and external radiation doses in Duchesne County resulting from NTS fallout were relatively low in magnitude, particularly when they are compared with corresponding doses from

**3.** To date, no excess incidence of neurofibrosarcoma and CNS tumor has been detected in Utah by the University of Utah researchers. Moreover, according to Dr. Joseph Lyon, who is directing the University's studies, it is improbable that an increased incidence will be found. *See* paragraph 4 of the Affidavit of Dr. Joseph L. Lyon (Exhibit A, Memorandum).

**4.** Dr. Pendleton died in 1982. Prior to Dr. Pendleton's death, Dr. Lloyd, a close associate of Dr. Pendleton at the University of Utah, was designated as custodian of Dr. Pendleton's fallout data collection. *See* paragraph 2 of the Affidavit of Dr. Ray D. Lloyd (Exhibit G, Memorandum).

natural sources of external radiation and internal radioactivity.

A second dose calculation study was performed at the Lawrence Livermore National Laboratory (LLNL) by Dr. L.R. Anspaugh, head of the LLNL Environmental Sciences Division. In his affidavit (Exhibit F, Memorandum) at paragraph 3, Dr. Anspaugh reports:

It is my expert opinion, as a matter of reasonable scientific certainty, that the best estimate of the whole body dose is 0.28 rads for Lynette Tew [who contracted CNS tumor] and 0.0035 rads for Becky Farnsworth [who contracted neurofibrosarcoma].

As Dr. Lloyd explains in paragraphs 4 and 6 of his affidavit (Exhibit G, Memorandum), the Pendleton measurements and the measurements relied upon by LLNL were independently made, yet the resultant dose calculations mutually confirm negligible doses to plaintiffs' decedents:

The soil samples used in the Anspaugh (LLNL) report were different samples from those to which I had access [the Pendleton measurements], taken at a different by different people. Although the methodology of calculating the fallout Cs–137 in 1955 was the same in the Anspaugh analysis and in the present [Lloyd] analysis, the samples for which the calculations were done were not the same, so that there is independence between the two analyses.

\* \* \* \* \* \*

I have examined the external and internal dose calculations by Dr. Anspaugh of Lawrence Livermore National Laboratory.... It is my opinion that the conclusions about the total body radiation doses to the two subjects named above [plaintiffs' decedents] given in the LLNL report are compatible with my own conclusions, and it should be noted that I relied upon independent data for my calculations. It is my opinion that the LLNL report is confirmatory of my conclusions.

In paragraph 4 of his affidavit Dr. Lloyd further observes that, whether the lower University of Utah doses or the higher LLNL doses are considered, the dose

... in both cases was a small fraction of the external exposure from natural sources, such as cosmic rays from outer space; uranium, thorium, potassium, etc., in the earth, food, household goods, our own and other peoples' bodies, and building materials; natural radioactivity in the air and so on.

Finally, in paragraph 8 of his affidavit Dr. Lloyd states that the plaintiffs' decedents' doses are so "many times lower than any credible estimate of natural background radiation for even a small fraction of a year" that attributing carcinogenic effects to such small doses would be "fruitless."

In addition to the studies done by Dr. Anspaugh at LLNL and by Dr. Lloyd at the University of Utah, the United States also commissioned a study by researchers at the University of Utah's Thermoluminescence Laboratory, which commenced in June 1983 and employed a technique called "thermoluminescence dosimetry." Essentially, this technique involved determining the doses of external gamma radiation which may have been received in quartz particles taken from residential housing bricks in various communities in Duschesne County, Utah, where plaintiffs and plaintiffs' decedents lived.

The thermoluminescence measurements reveal the total dose received by the brick or other ceramic material, such as toilet tank tops, since it was fired in the kiln. The University of Utah scientists obtained permission to remove one-inch diameter brick cores from various homes in Duchesne County, then measured the radiation to which the quartz particles in the brick cores had been exposed. This measurement constituted the total radiation to which the sample had been exposed since firing in the kiln. To determine the natural background radiation dose to the sample, small dosimeters were placed near the holes from which the brick cores were removed. The background dose measured by

the dosimeters was then subtracted from the gross dose to the brick cores to determine what amount of "non-natural" radiation, such as fallout, the bricks had absorbed.

The results of the brick study are set forth in a report entitled, "Summary of TL Dose Estimates: Duchesne County, Utah," which is attached as Exhibit 5 to the Affidavit of Drs. Wrenn, Haskell, and Kaipa (Exhibit I, Memorandum). The results do not show a statistically significant radiation dose in excess of natural background radiation.

After the University of Utah laboratory advised plaintiffs' counsel of the preliminary dose findings, plaintiffs' counsel requested that the laboratory determine the dose to the quartz particles in some toilet tank tops from residences in Blue Bell and Upalco, Utah, which are communities in the vicinity of plaintiffs' homes. Counsel for the United States agreed to seek funding for this study and plaintiffs' counsel submitted two tank tops to the laboratory for analysis. *See* Memorandum, page 16.

The University of Utah report states, "It is noteworthy that the net dose measurements made on the samples taken from indoors (tank tops) did not differ significantly from those made on the exterior brick samples." *See* footnote 9 of Exhibit 5 of the Affidavit of Drs. Wrenn, Haskell, and Kaipa (Exhibit I, Memorandum).

Dr. Lloyd, who calculated the doses to plaintiffs' decedents using Dr. Pendleton's fallout data, also reviewed the Thermoluminescence Laboratory's findings and noted that the brick and tank top studies support one another, as well as his own calculations:

Additionally, I have examined the results of thermoluminescence measurements of building brick and toilet tank covers collected in Duchesne County, Utah, by Dr. Edwin Haskell and his associates at the University of Utah. Although the stated uncertainties in their output data are comparatively substantial, it is my opinion that their relatively low estimates of external radiation doses in excess of

background (including global fallout and fallout from NTS, and a total of near zero is not excluded by their data) confirm, within the limits of their stated uncertainty, my calculations which indicate that the NTS fallout exposures in Duchesne County have been quite low. Also a comparison of the Haskell estimates of radiation exposure in the Duchesne area in excess of background from the several measurements of brick and from the measurements of toilet tank covers indicates that these two kinds of estimates are compatible with and confirmatory of each other. It is evident from their data that there has not been an episode of relatively high exposure to ionizing radiation in the Duchesne area.

Dr. Lloyd concludes:

Based upon Dr. Pendleton's data, my own calculations and my evaluation of the pertinent reports of Dr. Anspaugh of LLNL as well as the pertinent data of Dr. Haskell of the University of Utah, it is my opinion as a matter of reasonable scientific certainty that the purported diseases contracted by Lynette Tew and Becky Farnsworth were not caused by exposure to ionizing radiation from radioactive fallout originating at the Nevada Test Site.

*See* paragraph 7 and 9 of Dr. Lloyd's affidavit (Exhibit G, Memorandum).

Dr. Scheithauer of the Mayo Clinic and Dr. Hutchison of the Harvard School of Public Health agree with this conclusion. In paragraph 7 of his affidavit (Exhibit C, Memorandum), Dr. Scheithauer states:

As my own research and the medical literature indicate that neurogenic sarcoma has not been associated with radiation exposure where the radiation dosage has been less than several hundred rads, it is my expert medical opinion, stated as a matter of reasonable medical probability, that Becky Farnsworth's neurogenic sarcoma was not caused by exposure to radioactive fallout from the Nevada Test Site.

Dr. Hutchison in paragraph 7 of his affidavit (Exhibit D, Memorandum) similarly states:

Based on the reported radiation exposures and the pathology of tumors diagnosed for the two patients Lynette Tew and Becky Farnsworth it may be concluded from the available epidemiologic knowledge of radiation carcinogenesis that the probability of radiation induction of a tumor of either of these types is exceedingly remote. For the patient Lynette Tew, with exposure of .28 rad and an uncertain diagnosis of a brain tumor, there is a probability of approximately one in one million of such a tumor's arising as a result of this irradiation. For the patient Becky Farnsworth, with exposure 0.0035 rad and a diagnosis of a peripheral nerve malignant tumor there is a probability of about one in one hundred million of such a tumor's arising as a result of this irradiation.

It is further noted that the radiation dose of 0.28 rad is the background dose received by an average person in about 3 years. The dose of 0.0035 is the background dose received in about 2 weeks. It follows that all persons are subject to a carcinogenic effect of irradiation from background larger than the added effect, if any, to which these two patients were subjected.

On the basis of the above observations it is my expert opinion, stated as a matter of reasonable epidemiologic probability, that neither of the two tumors discussed was caused by exposure to radioactive fallout from the Nevada Test Site.

5. Plaintiffs did not respond to the United States' Motion for Partial Summary Judgment within the time period prescribed by Rule 5(e) of the Rules of Practice of the United States Courts for the District of Utah. However on April 10, 1985, this Court extended the time period for plaintiffs to respond to the United States' motion until May 8, 1985.

On May 13, 1985, plaintiffs' counsel, Allen M. Swan, advised the United States' counsel, Ralph H. Johnson, that plaintiffs had determined that they could not and would not respond to the United States' summary judgment motion, but would not stipulate to a dismissal.

Rule 56(e) provides in pertinent part:

## IV. CONCLUSION

Based upon the uncontradicted[5] statements of the numerous experts cited above, this Court finds, as a matter of reasonable medical certainty and law, that the diseases contracted by plaintiffs Gil Mitchell and Lucille Whitehead and plaintiffs' decedents Becky Farnsworth and Lynette Tew were not caused by exposure to radioactive fallout from the Nevada Test Site. Therefore, the United States' Motion for Partial Summary Judgment is hereby granted and this action, as it pertains to the claims of the plaintiffs and plaintiffs' decedents discussed above, is dismissed with prejudice.

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. The United States' Motion for Partial Summary Judgment is fully supported by affidavits of many of the nation's leading scientists in the subject areas of medicine, radiobiology, epidemiology and dosimetry. Summary judgment is clearly appropriate.